IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| ROMEY SCHWIETERMAN, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION FILE |
| | ) | |
| vs. | ) | NO. 1:20-CV-2611-SCJ |
| | ) | |
| CATERPILLAR INC., | ) | |
| | ) | |
| Defendant. | ) | **JURY TRIAL DEMANDED** |
| | ) | |

<u>VERIFIED AMENDED COMPLAINT</u>

Plaintiff Romey Schwieterman ("Plaintiff"), in accordance with the Court's Order dated January 27, 2020 [Dkt. No. 29], hereby makes and files this Amended Complaint against Defendant Caterpillar Inc. ("Defendant" or "Caterpillar"), asserting claims for misappropriation of trade secrets under the Georgia Trade Secrets Act of 1990, O.C.G.A. §§ 10-1-760 *et seq.,* breach of contract, breach of implied duty of good faith and fair dealing, and tortious interference with contractual relations or business relations, respectfully showing the Court as follows:

## I.   **THE PARTIES**

1.    Plaintiff Romey Schwieterman is a citizen of the State of Georgia. Plaintiff's domicile is the State of Georgia.  Plaintiff is a resident of Powder Springs,

Cobb County, Georgia. And his intention is to remain a citizen and a resident of the State of Georgia indefinitely.

2.    Defendant Caterpillar Inc. is the world's largest manufacturer of construction equipment, and also designs, manufactures, and sells a large range of products across numerous industries worldwide.  Caterpillar equipment is sold and serviced in the United States through a nationwide network of dealers, supported by Caterpillar offices, including several in Georgia.  Caterpillar Inc. is a publicly-traded Delaware corporation and has its principal place of business at 510 Lake Cook Road, Ste. 100, Deerfield, Illinois 60015.  Pursuant to 28 U.S.C. § 1332(c)(1), Defendant is a citizen of the States of Delaware and Illinois.

3.    Defendant Caterpillar Inc. is registered to do business in Georgia and regularly and systematically conducts business throughout the United States, including in the State of Georgia.  Caterpillar Inc. may be served with process through its registered agent Corporation Process Company, 180 Cherokee Street, N.E., Marietta, Georgia 30060.

## II.    JURISDICTION AND VENUE

4.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and it is an action brought by a citizen of a State that

is different from the State where the Defendant is incorporated or has its principal place of business.  Plaintiff is a citizen of the State of Georgia, and Defendant is a citizen of the States of Delaware and Illinois.

5.     This Court has personal jurisdiction over Defendant, a significant provider of a wide range of products and services to countless industries around the world, because Defendant regularly markets and sells its products throughout the State of Georgia and derives substantial revenue from goods and services provided to companies and individuals in Georgia.

6.     This Court also has personal jurisdiction over Defendant pursuant to the Georgia Long-Arm Statute, O.C.G.A. § 9-10-91, because Defendant has transacted and continues to transact business within the State of Georgia; has purposefully directed, and continues to purposefully direct, its misappropriation activities within the State of Georgia; and has performed some of the acts complained of herein within the State of Georgia.

7.     Venue is proper in this district under 28 U.S.C. §§ 1391(b) and (c) because (1) Defendant regularly transacts business and has a regular and established place of business in the judicial district; (2) Plaintiff's domicile is in this judicial district; and (3) a substantial portion of the events giving rise to the claims herein occurred within this judicial district.

## III.   FACTUAL ALLEGATIONS

### THE PARTIES

8.     Plaintiff Romey Schwieterman had worked as a Senior Sales Engineer with Yancey Power Systems, a part of Yancey Bros., since 1995.

9.     Yancey Bros., which is located in Austell, Cobb County, Georgia, is the nation's oldest Caterpillar dealer.

10.    Defendant Caterpillar Inc. is the world's largest manufacturer of construction equipment.  Caterpillar also designs, manufactures, and sells a large range of products across numerous industries worldwide.  Caterpillar equipment is sold and serviced in the United States through a nationwide network of dealers, including Yancey Bros. in Georgia, supported by Caterpillar offices.

11.     Prior to his employment with Yancey Bros., Mr. Schwieterman was employed by the Caterpillar corporate office in Illinois for over seven years, working primarily on marketing power systems for marine engines, marine generators, and electrical power systems for the Application Engineering department and as a marketing representative.

12.    On June 23, 2020, four days after filing the instant action against Caterpillar, and immediately after Caterpillar called Yancy Bros. regarding this lawsuit, Mr. Schwieterman was fired by Yancey Bros.

## THE BASS SYSTEM

13.     As a result of his extensive experience in working with Caterpillar and other engine and generator products, the installation of those products, and the needs of the end-users of those products, in addition to his experience working for his family business in servicing and selling marine vessels, marine engines and generators from 1982-1987, Mr. Schwieterman became aware of issues with and potential improvements to Caterpillar's (and all brands of) power and generator control system product offerings, including redundant starting systems with battery selectors.

14.     These types of products would typically be implemented in marine engines and generators, data centers, hospitals, wastewater treatment plants, pump stations, industrial systems, petroleum systems, micro-grid and other mission critical systems in order to ensure reliable backup power capabilities.

15.     Because of his knowledge and experience, he was able to independently develop his own new solution to at least one of the issues which would also substantially improve the performance and efficiency of current Caterpillar offerings, as well as reduce costs.  Mr. Schwieterman called his invention the Best Available Starting System (or "BASS").   Mr. Schwieterman independently developed the BASS technology on his own time and using his own equipment.

16.     In addition to providing a substantial competitive advantage due to cost savings, the BASS technology has the potential to completely eliminate the need for an expensive third-party product known as a "Best Battery Selector."  The BASS system could also be implemented in any engine or control power system that would benefit from a cost-effective redundant starting system and control power source, including industrial engines, heavy duty mining trucks and equipment with electric drive systems, marine engines, and marine generators.

17.     Mr. Schwieterman considered his BASS technology a trade secret and took reasonable steps to ensure its confidentiality.

<h3 style="text-align:center">THE PARTIES' DISCUSSIONS</h3>

18.     In late 2013, Mr. Schwieterman had conversations with Caterpillar employees, including product development engineers, related to many of the issues he was aware of with and potential improvements to Caterpillar's power and generator control system offerings, including those related to its redundant starting systems with battery selectors.

19.     At the outset of these discussions, Mr. Schwieterman informed Caterpillar that he had developed a technology and that he believed would substantially improve the performance and efficiency of the current Caterpillar offerings and reduce costs.

20.     During these initial discussions, Mr. Schwieterman made Caterpillar aware that he had independently developed the BASS technology and the general concept of how it might be beneficial to Caterpillar. Mr. Schwieterman did not disclose the design, makeup, and function of his invention to Caterpillar.  Mr. Schwieterman made it clear to Caterpillar that he would not disclose any detailed information regarding his BASS technology without assurances that Caterpillar would maintain the confidential nature of any information disclosed and that he would be reimbursed should Caterpillar eventually make use of the technology.

21.     Following these initial discussions, Mr. Schwieterman and Caterpillar mutually expressed interest in working together to further develop the system for incorporation into Caterpillar products and to license the trade secret system to Caterpillar should that occur.

22.     After the parties agreed to work together, Caterpillar initially told Plaintiff not to "get his hopes up" because Caterpillar would have no obligation to compensate Plaintiff if the BASS technology was not effective or did not provide cost savings.  However, both Caterpillar and Mr. Schwieterman clearly understood that, once it was determined that the BASS technology was effective and reduced costs, they would move forward with incorporating it into Caterpillar products and Caterpillar would compensate Plaintiff for its use.

23.     During the process of affirming the effectiveness and cost-savings of the BASS technology, Caterpillar promised Plaintiff that he could trust them to enter into discussions related to his trade secret technology.   Caterpillar used these promises and its long-standing relationship with Plaintiff—Plaintiff had worked for Caterpillar and now its oldest independent dealer for decades—to convince Plaintiff to disclose substantial details of his trade secret with promises of compensation if the technology proved effective.   Caterpillar expressly assured Plaintiff that the discussions would "be about trust…based on a longstanding relationship of cooperation and idea sharing with [Mr. Schwieterman]" and that they would not even be taking place if it was "with someone else that was not from a business partner like Yancey."  In fact, Caterpillar assured Plaintiff that his trade secret would be kept confidential because Caterpillar wanted to use the new technology for an advantage over its competitors.

24.     Caterpillar continued to press Plaintiff for substantial additional disclosures regarding his trade secret technology and to offer him assurances that the parties would continue to jointly work on implementing the BASS technology in Caterpillar products and that Plaintiff would be compensated.  As part of the parties' joint venture agreement, Mr. Schwieterman also agreed to continue to provide his know-how and experience regarding his BASS technology and Caterpillar products

and customer needs to Caterpillar, as well as documents and other things (*e.g.*, marketing materials, technical bulletins, and training materials) to assist in the most effective implementation of the BASS technology.

25.    Between late 2013 and mid-2016, Plaintiff had numerous meetings, calls, emails, and other communications with individuals at Caterpillar regarding his trade secret technology.  As part of these discussions and based on Caterpillar's express promise that they would keep the information confidential and that he would be compensated if the technology were incorporated into products, Mr. Schwieterman provided Caterpillar with detailed designs, drawings, schematics, costs-estimates, and other material regarding his trade secret technology.  Mr. Schwieterman also explained that he had working prototypes and access to installations that incorporated certain aspects of his trade secret technology.

26.    Based on the information provided by Plaintiff, the Caterpillar engineers were soon able to confirm that Plaintiff's BASS technology was indeed a substantial improvement over Caterpillar's system at the time and would save Caterpillar many millions of dollars if implemented in its products.

27.    During the parties' discussions, Caterpillar acknowledged to Plaintiff that, while it had previously received a customer inquiry overseas for a product that may have incorporated some of the technology embedded in Plaintiff's trade secret,

Caterpillar had never developed, manufactured, or sold such a product. In fact, Caterpillar confirmed that no Caterpillar employee anywhere in the world was working on developing such a product or that Caterpillar had even understood the substantial benefits of Plaintiff's trade secret.

28.    Based on the information provided by Plaintiff, the Caterpillar engineers were also able to confirm that the use of Plaintiff's technology would result in a cost savings of approximately $5,000 to $7,000 per unit. Based on these projected cost savings, Caterpillar confirmed that a payment to Plaintiff of approximately 8%, or $400 to $560 per unit, would be expected for similar savings based on the market.

29.    Accordingly, Caterpillar was aware of the substantial financial value of Plaintiff's trade secrets from early in the parties' discussions.

30.    The parties' discussions as part of the joint venture agreement also involved working toward development of a cooperative platform or program that would encourage sharing of intellectual resources within the Caterpillar family by providing financial incentives to Caterpillar dealer engineers, sales representatives, technicians, project managers, and others who were willing to work with Caterpillar to invent and develop products, and that the joint venture with Plaintiff could be used as a model for that program.

## THE MISAPPROPRIATION AND BREACH

31.     At some point during the discussions, without notice to or authorization by Plaintiff, Defendant began to covertly incorporate Plaintiff's trade secrets into its products, including at least the EMCP 4.4 Supervisory Control Panel product offerings.

32.     Through his own investigation, Plaintiff discovered the potential issue and confronted Defendant, but Caterpillar continued to mislead Plaintiff with assurances that they would compensate him for use of his valuable trade secret information.

33.     Defendant in fact later admitted that it should have advised Plaintiff and acknowledged it needed to compensate him for his contributions.  In mid-2016, during an in-person meeting, Defendant acknowledged that Plaintiff should have been paid for the use of his trade secret BASS technology in the Caterpillar products, but claimed that over the course of the discussions, individuals involved with the relevant engineering and IP groups at Caterpillar had either left Caterpillar or moved to different positions within the company, causing repeated delays with the negotiations.  Shortly thereafter, Defendant ceased responding to Plaintiff altogether.

34.     Plaintiff never authorized or licensed his trade secrets to Defendant. Plaintiff has never received any compensation from Defendant for its use of

Plaintiff's trade secrets or for sales of Caterpillar products incorporating Plaintiff's trade secrets.

35.    Despite its repeated assurances and express agreement that it would maintain the secrecy of Plaintiff's trade secrets and not utilize them without compensating Plaintiff for the use of the valuable information, Caterpillar utilized Plaintiff's BASS technology its own products without Plaintiff ever providing express or implied consent for it to do so.

36.    Throughout the purported joint venture, Caterpillar willfully and maliciously induced Plaintiff into disclosing his valuable trade secret information while continuously promising that it would maintain the secrecy of the information and pay him for its use, despite having no intention of doing so.  Accordingly, these actions by Defendant, followed by its breach of the joint venture agreement and misappropriation of the trade secrets, were done with the specific intent to injure Plaintiff.

37.    As a result of Defendant's actions, Plaintiff has suffered irreparable harm due to the loss of economic value of those trade secrets and associated intellectual property rights, as well as the loss of potential customers and contracts for other licensed products utilizing those trade secrets.  He will continue to suffer

such harm until and unless Defendant's misappropriation is enjoined.  Moreover, there is no other adequate remedy at law other than an injunction.

## THE TORTIOUS INTERFERENCE

38.     On the morning of June 23, 2020, four days after the Complaint in this action was filed [Dkt. No. 1], Plaintiff received a call from his Sales Manager, Dave Carpenter. Mr. Carpenter informed Plaintiff that Yancey had been contacted by Caterpillar regarding the filing of the suit.

39.     During the brief discussion, Mr. Carpenter acknowledged that he was aware that Plaintiff had spent time working with Caterpillar regarding potential cost reduction and technology advancement ideas and that Caterpillar had made use of some of Plaintiff's ideas.

40.     Mr. Carpenter requested that Plaintiff come into the office as soon as possible in order to have a discussion with the Senior Vice President of Strategy and Chief Legal Counsel for Yancey Bros., Billy Holley.

41.     Upon arriving at the office later that morning, Plaintiff was confronted in a conference room by several individuals from Yancey Bros., including Mr. Holley.  Mr. Holley informed Plaintiff that he had received a call from an attorney at Caterpillar and that Plaintiff was being terminated because he had filed a lawsuit against Caterpillar.

42.     Upon information and belief, Caterpillar requested that Yancey Bros. fire Mr. Schwieterman because he filed this instant action against Caterpillar.

43.     At this meeting, Mr. Holley admitted that Plaintiff was an employee who "can't be replaced" and asked why Plaintiff did not come to him prior to filing the suit.

44.     In January 2020, Plaintiff had expressed his concerns in person to Mr. Holley that Caterpillar was making use of technology that he had developed without compensating him.  At that time, Mr. Holley responded that Plaintiff "should sue them."  When Plaintiff expressed concerns at that time that a suit against Caterpillar might endanger his employment with Yancey Bros., Mr. Holley had assured him that he did not believe that Plaintiff would be fired for filing suit against Caterpillar because he was too valuable to Yancey Bros.

45.     When Caterpillar contacted Mr. Holley, through its attorney, less than two business days after the Complaint was filed, it did so with the purpose of maliciously procuring or otherwise coercing and inducing Plaintiff's termination from Yancey Bros.—with the vindictive intent to injure and punish Plaintiff for filing this suit.   In effect, Caterpillar successfully convinced Yancy Bros. to terminate Plaintiff when only months prior the company had encouraged Plaintiff to file this suit.

46.    Prior to his termination on June 23, 2020, Plaintiff was a party to an employment contract with Yancey Bros. Plaintiff's abrupt termination due to Caterpillar's interference was the end of Plaintiff's contract with Yancey Bros. as well as the over 25-year business relationship between Plaintiff and Yancey Bros.

47.    Caterpillar was not a party to the agreement between Plaintiff and Yancey Bros. and its contacting of Yancey Bros. to procure the termination of Plaintiff was improper and done without privilege.

48.    As a result of Caterpillar's tortious interference with his relationship with Yancey Bros., Mr. Schwieterman suffered significant harm.  Mr. Schwieterman lost income, including significant commissions related to deals that were near finalization for Yancey Bros.

IV.    COUNT I: MISAPPROPRIATION OF TRADE SECRETS

49.    Defendant has marketed and sold and continues to market and sell products that contain and utilize trade secret information received from Plaintiff, including, but not limited to, technical and nontechnical data, formulas, patterns, compilations, programs, devices, methods, techniques, drawings, processes, and product plans that were not then and are not now commonly known by or available to the public and that derive their economic value, actual or potential, from not being generally known to, and not being readily ascertained by proper means by, other

persons who can obtain economic value from their disclosure or use, and constitute trade secrets under the Georgia Trade Secrets Act of 1990, O.C.G.A. §§ 10-1-760 *et seq*.

50.     Plaintiff's trade secrets were subject to Plaintiff's efforts that were reasonable under the circumstances to maintain their secrecy (*see*, *e.g.*, supra ¶¶ 17, 20, 23), including obtaining acknowledgement from Defendant that (1) the information was confidential and could provide a substantial competitive benefit to Defendant (*see*, *e.g.*, supra ¶¶ 21-26, 28-29), (2) the trade secrets were being shared confidentially in connection with a negotiation of the joint venture described herein (*see*, *e.g.*, supra ¶¶ 21-30), and (3) the trade secrets were being shared subject to other common law, statutory and contractual obligations owed to Plaintiff by Defendant.  *See*, *e.g.*, supra ¶¶ 18-30.

51.     In furtherance of their joint venture, Defendant agreed to maintain the secrecy and confidentiality of Plaintiff's trade secrets.  *See*, *e.g.*, supra ¶¶ 21-25.

52.     Without notice to Plaintiff, Defendant secretly disclosed and utilized Plaintiff's trade secrets without Plaintiff's express or implied consent.  *See*, *e.g.*, supra ¶¶ 31-35.  Moreover, at the time of disclosure and use of Plaintiff's trade secrets, Defendant knew that the trade secrets were acquired under circumstances giving rise to a duty to maintain their secrecy or limit their use or were derived from

or through a person who owed a duty to Plaintiff to maintain their secrecy or limit their use. *See, e.g.*, supra ¶¶ 20-25.

53.     Defendant nevertheless sold its products (which utilized and contained Plaintiff's trade secrets) to third parties and derived economic value from the misappropriation of Plaintiff's trade secrets and have deprived Plaintiff of the economic value of those trade secrets.

54.     Defendant's activities constitute a violation of the Georgia Trade Secrets Act of 1990, O.C.G.A. §§ 10-1-760 *et seq*.

55.     Plaintiff should be awarded damages pursuant to O.C.G.A. § 10-1-763(a). *See, e.g.*, supra ¶ 37.

56.     Defendant's misappropriation of Plaintiff's trade secrets is willful and malicious so that exemplary damages and reasonable attorneys' fees should be awarded to Plaintiff pursuant to O.C.G.A. § 10-1-763(b) and 764. *See, e.g.*, supra ¶¶ 23-24, 32-33, 36.

57.     Defendant's misappropriation of Plaintiff's trade secrets has caused, and continues to cause, irreparable harm to Plaintiff, and there is no adequate remedy other than an injunction. Plaintiff will continue to suffer damage and irreparable harm unless and until Defendant's conduct is enjoined by this Court pursuant to O.C.G.A. § 10-1-762.

## V.    COUNT II: BREACH OF CONTRACT (EXPRESS JOINT VENTURE)

58.    The parties entered into an express contractual arrangement in which the parties agreed to pursue a joint venture for the development of Plaintiff's trade secret BASS technology for incorporation into Caterpillar products. *See*, *e.g.*, supra ¶¶ 21-30.  As part of this agreement, Defendant agreed to maintain the secrecy and confidentiality of Plaintiff's trade secrets and to compensate Plaintiff for assistance in development of the technology and incorporation of the technology into Defendant's products. *See*, *e.g.*, supra ¶¶ 21-25.  In exchange, Plaintiff agreed to provide his trade secret information, documentation, and know-how to Defendant as necessary to implement the trade secret technology in Defendant's products. *See*, *e.g.*, supra ¶¶ 24-26.

59.    Plaintiff complied with all, or substantially all, of the conditions and obligations of the agreement. *See*, *e.g.*, supra ¶¶ 23-26.  By failing to maintain the secrecy and confidentiality of Plaintiff's trade secrets and making and selling products that incorporate Plaintiff's trade secret technology without Plaintiff's permissions and without providing any compensation to Plaintiff, Defendant materially breached the contract.

60.     Defendant's breach of the joint venture agreement proximately caused substantial damage and continues to cause substantial damage to Plaintiff.  *See*, *e.g.*, supra ¶ 37.

VI.     COUNT III: BREACH OF CONTRACT (IMPLIED JOINT VENTURE)

61.     The parties entered into an implied contractual arrangement, by oral and written communications, in which the parties agreed to pursue a joint venture for the development of Plaintiff's trade secret BASS technology for incorporation into Caterpillar products.  *See*, *e.g.*, supra ¶¶ 21-30.  As part of this agreement, Defendant agreed to maintain the secrecy and confidentiality of Plaintiff's trade secrets and to compensate Plaintiff for assistance in development of the technology and incorporation of the technology into Defendant's products.  *See*, *e.g.*, supra ¶¶ 21-25.  In exchange, Plaintiff agreed to provide his trade secret information, documentation, and know-how to Defendant as necessary to implement the trade secret technology in Defendant's products.  *See*, *e.g.*, supra ¶¶ 24-26.

62.     Plaintiff complied with all, or substantially all, of the conditions and obligations of the contract.  By failing to maintain the secrecy and confidentiality of Plaintiff's trade secrets and making and selling products that incorporate Plaintiff's trade secret technology without Plaintiff's permissions and without providing any compensation to Plaintiff, Defendant breached the contract.

63.     Defendant's breach of the joint venture agreement proximately caused substantial damage and continues to cause substantial damage to Plaintiff.  *See*, *e.g.*, supra ¶ 37.

VII.   COUNT IV: BREACH OF IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING

64.     The joint venture agreement between Plaintiff and Defendant imposed upon each party a duty of good faith and fair dealing in the performance of their respective duties and obligations pursuant to common law and under O.C.G.A. § 11-1-304.

65.     Defendant breached its duty of good faith and fair dealing by deceiving Plaintiff into providing Defendant with information, know-how, and assistance (all provided in furtherance of and pursuant to the joint venture agreement) (*see*, *e.g.*, supra ¶¶ 21-26), and then marketing and selling the products incorporating Plaintiff's trade secret BASS technology on its own without Plaintiff's knowledge or consent and without compensating Plaintiff in any way.  *See*, *e.g.*, supra ¶¶ 31-35.

66.     Defendant's breach of its duties of good faith and fair dealing proximately caused substantial damage and continues to cause substantial damage to Plaintiff.  *See*, *e.g.*, supra ¶ 37.

VIII.  COUNT V: TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS OR BUSINESS RELATIONS

67.     Without privilege, and without permission, authorization or even notice, Defendant acted improperly and wrongfully by contacting Plaintiff's

employer, Yancey Bros., with the intent to procure the termination of Plaintiff's employment.  *See*, *e.g.*, supra ¶¶ 38-47.

68.   Defendant's actions were done with malice and with the specific intent to injure Plaintiff.  *See*, *e.g.*, supra ¶ 45.  Defendant's actions resulted in the termination Plaintiff's employment, inducing Yancey Bros to breach the valid contract for his employment as well to discontinuance the 25-year business relationship between Plaintiff and Yancey Bros.  *See*, *e.g.*, supra ¶¶ 38, 41, 46.

69.   Defendant's illegal conduct has directly and proximately caused significant monetary damages to Plaintiff.  The precise amount of monetary damages suffered by Plaintiff as a result of Defendant's illegal conduct will be proven at trial.  *See*, *e.g.*, supra ¶ 48.

IX.   <u>REQUEST FOR RELIEF</u>

WHEREFORE, Plaintiff respectfully requests the following relief:

1.   A judgment that:

(a)   Defendant has misappropriated Plaintiff's trade secrets;

(b)   Defendant has willfully and maliciously misappropriated Plaintiff's trade secrets;

(c)   Defendant has violated Plaintiff's contractual rights;

(d)   Defendant has breached the implied duty of good faith and fair dealing; and

(e)   Defendant has tortiously interfered with Plaintiff's contractual relations and business relations.

2.   An award to Plaintiff of damages recoverable under the laws of the State of Georgia on each count in the Complaint, including any and all actual, compensatory, and punitive damages, and damages for Defendant's misappropriation in accordance with O.C.G.A. § 10-1-763(a);

3.   An award to Plaintiff of exemplary damages against Defendant, resulting from Defendant's willful and malicious misappropriation in accordance with O.C.G.A. § 10-1-763(b);

4.   An award to Plaintiff of his costs and reasonable attorneys' fees in accordance O.C.G.A. § 10-1-764;

5.   An award to Plaintiff of pre-judgment and post-judgment interest;

6.   A permanent injunction enjoining Defendant and its officers, directors, agents, servants, affiliates, employees, divisions, branches, subsidiaries, parents and all other actors acting in concert therewith from continuing to misappropriate Plaintiff's trade secrets; and

7.   Any and all other relief that the Court deems just and proper.

X.    <u>JURY DEMAND</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff respectfully demands a trial by jury of all issues so triable.

Respectfully submitted, this 10th day of February, 2021.


HERMAN JONES LLP

*/s/ Carlton R. Jones*

John C. Herman
   (Ga. Bar No. 348370)
Peter M. Jones
   (Ga. Bar No. 402620)
Carlton R. Jones
   (Ga. Bar No. 940540)
HERMAN JONES LLP
3424 Peachtree Road, N.E., Suite 1650
Atlanta, Georgia 30326
Telephone:  (404) 504-6500
Facsimile:  (404) 504-6501
jherman@hermanjones.com
pjones@hermanjones.com
cjones@hermanjones.com

Counsel for Plaintiff
Romey Schwieterman

VERIFICATION

I, Romey Schwieterman, hereby verify that I have authorized the filing of

the attached Verified Amended Complaint, that I have reviewed the Verified

Amended Complaint and that the facts therein are true and correct to the best of my

knowledge, information and belief.

Upon penalty of perjury, executed on this 10th day of February, 2021.


By:

Romey Schwieterman

*Plaintiff*

- 24 -

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 10, 2021, I electronically filed the above document with the Clerk of Court using CM/ECF which will send electronic notification of such filing to all registered counsel.

By: /s/ *Carlton R. Jones*
     Carlton R. Jones
      (Ga. Bar No. 940540)
     HERMAN JONES LLP
     cjones@hermanjones.com